UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES OF AMERICA | Criminal No. 3:99cr244 (JBA) |
| v. | |
| JEROME SUGGS | June 28, 2021 |

**RULING GRANTING IN PART DEFENDANT'S MOTION FOR SENTENCING RELIEF**

Defendant Jerome Suggs moves the Court for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) and pursuant to § 603 of the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018), on the grounds that his medical conditions, including obesity, hypertension, and arteriosclerotic cardiovascular disease (ASCVD), in the context of the COVID-19 pandemic, make him particularly vulnerable to serious illness or death from the virus, and because the twenty-two years of his incarceration served, coupled with his rehabilitation over the past two decades, constitute extraordinary and compelling reasons warranting his release. (Def.'s Mem. in Support of Mot. for Sentence Reduction [Doc. # 127-1] at 1). The Government does not dispute Mr. Suggs's medical eligibility but opposes his release in light of his lengthy and violent criminal history, weak release plan, and insufficient rehabilitation while in prison. (Gov't's Response to Def.'s Mot. [Doc. # 129] at 14, 19, 25-28.) For the reasons that follow, Defendant's motion for sentencing modification is GRANTED and his life sentence reduced to a term of 360 months, or thirty years, followed by eight years supervised release.

I.  **Background**

On September 8, 2000, Mr. Suggs, at age 36, was convicted by jury verdict of violating 18 U.S.C. 1951, Hobbs Act Robbery, and 18 U.S.C. 924(c)(1)(A), use of a firearm in

1

connection with a crime of violence, and sentenced to two consecutive life sentences. (Amend. J. [Doc. # 113].) He also received a sentence of thirty years of imprisonment with five years of supervised release for his guilty plea to felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1), to run concurrently with the life sentence imposed for the robbery. (Judgment at 1.) His life sentence on Count One was imposed in compliance with 18 U.S.C. § 3559(c)(1), which requires a sentence of life for individuals who have previously been convicted of two or more serious violent felonies.[1] (*Id.*) *See also* 18 U.S.C. § 3559(c)(1). Known colloquially as the Three Strikes Rule, § 3559(c)(1) is triggered by the Government's notice of prior convictions under 21 U.S.C. § 851. Mr. Suggs was the first and remains the only inmate currently serving a life sentence pursuant to a § 851 enhancement in the District of Connecticut.[2]

a. *Procedural Background*

Mr. Suggs's convictions were first affirmed by the Second Circuit on August 6, 2001. *United States v. Suggs*, No. 00-1637, 14 F. App'x 54, 55 (2d Cir. 2001). He then moved to vacate his sentence [Doc. # 85], pursuant to 28 U.S.C. § 2255, which was denied on May 17, 2005 [Doc. # 95]. (*See* Mandate of USCA [Doc. # 100] (dismissing appeal for failing to make

---

[1] Defendant's consecutive life sentence on Count Two, for violating § 924(c), was imposed pursuant to the then-mandatory Sentencing Guidelines, which required him to be sentenced as a career criminal under U.S.S.G. § 4B1.1 based on his prior felonies and resulted in a *consecutive* mandatory sentence of life because, under § 4B1.1 and § 924(c), Count Two's consecutive sentence was required to be at least that of Count One's minimum sentence, which was life imprisonment due to the § 851 notice.

[2] Francisco Deida, the only other individual who received a mandatory life sentence under § 3559(c)(1) in the District of Connecticut, had his sentence reduced to 240 months' imprisonment under a stipulated plea agreement entered April 2, 2020, after the Government conceded that Deida's 28 U.S.C. § 2255 motion was meritorious because there was insufficient evidence to demonstrate that Deida was aware of a 2009 plea offer that would have avoided the Government filing the § 851 notice. *United States v. Deida*, No. 3:09-CR-127 (SRU), ECF No. 138 (D. Conn. Apr. 3, 2020).

a "substantial showing of the denial of a constitutional right").)[3] Mr. Suggs then sought permission to file a successive habeas petition based on the Supreme Court's subsequent holdings in *Johnson v. United States*, 576 U.S. 591 (2015), *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), and *United States v. Davis*, 139 S. Ct. 2319 (2019), which was granted by the Second Circuit on May 5, 2020. *Suggs v. United States*, No. 16-1671, ECF No. 72. That petition, filed before the Supreme Court's ruling in *Borden v. United States* and not yet briefed, remains pending. *Suggs v. United States*, 3:20-cv-634 (JBA); *see also Borden*, 593 U.S. _, 2021 WL 2367312, at *12 (2021) (holding that "[o]ffenses with a *mens rea* of recklessness do not qualify as violent felonies under ACCA").[4]

Mr. Suggs submitted his request for compassionate release to the BOP Warden of Otisville FCI on November 9, 2020, (Ex. B to Def.'s Mot. [Doc. # 127-3]), and, upon exhausting his administrative remedies within the BOP, filed the present motion on December 7, 2020, ([Doc. # 127]). As of June 2, 2021, he has served 264 months, or twenty-two years, on his life sentences and seeks release from Otisville FCI. FIND AN INMATE, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last accessed Jun. 28, 2021). As of June 28, 2021, one Otisville FCI staff member was positive for COVID-19, eighty-seven inmates and thirty-six staff members had recovered, and 471 of approximately 520 inmates have been fully

---

[3] After the judgment was amended to correct a clerical error, (Amend. J.), Mr. Suggs appealed that amended judgment, arguing that it constituted a wholly new judgment that was entitled to an "initial" appeal as of right. (*See* Ruling on Mots. to Transfer, *Suggs v. United States*, 3:12-cv-429 (JBA), ECF No. 11 (Sept. 25, 2014).). This successive motion was denied on December 29, 2014 for failing to state grounds upon which a successive motion could be considered. *Suggs v. United States*, No. 14-3618, ECF No. 22 (2d Cir. Dec. 29, 2014).

[4] One of Mr. Suggs's predicate offenses, (*see* Information to Establish Prior Convictions [Doc. # 37] at 1), relies on Conn. Gen. Stat. § 53a-59(a)(3), which criminalizes actions conducted "under circumstances evincing an extreme indifference to human life [in which offender] recklessly engages in conduct which creates a risk of death." Conn. Gen. Stat. § 53a-59(a)(3).

3

vaccinated. COVID-19, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed Jun. 28, 2021). There have been no COVID deaths to date associated with this facility. (*Id.*)

b. *Medical History*

The Government conceded that Mr. Suggs's medical conditions increase his risk of severe illness from COVID-19.[5] With a BMI of 31.6, Mr. Suggs is obese. He takes medication for hypertension and suffers from ASCVD, a type of cardiovascular disease that may restrict blood flow to organs and tissues which the Court assumes is among the cerebrovascular diseases that increases the risk of severe illness from COVID-19. (BOP Vitals, Ex. I to Def.'s Mot. [Doc. # 127-10]; BOP Health Service Health Problems, Ex. H to Def.'s Mot. [Doc. # 127-9].) Since the hearing on Defendant's motion, Mr. Suggs received the second dose of the two-dose Pfizer-BioNTech vaccine on April 22, 2021 and, as such, Mr. Suggs's risk of severe infection and death from the virus has been substantially reduced, but not eliminated. (Status Rep. [Doc. # 139] at 1; Immunization Record [Doc. # 139-2]).

c. *Criminal History*

Mr. Suggs's first interaction with the criminal justice system was at age 12 in 1975 when he was placed on juvenile probation for two counts of burglary. (Presentence Rep. [Doc. # 72] ¶ 52, 59) At age sixteen, he began using cocaine, dropped out of high school, and was incarcerated at the J.R. Manson Youth Institution (Manson) on December 14, 1979 for a

---

[5] The Court assumes the parties' familiarity with the ongoing COVID-19 pandemic and the increased risk it poses to people with obesity and heart conditions. *How COVID-19 Spreads*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html (last updated May 10, 2021); *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated May 13, 2021).

string of nonviolent burglaries and attempted burglaries he committed in Summer/Fall 1979. (*Id.* ¶¶ 29-38, 59, 66.) Mr. Suggs tried crack cocaine for the first time at Manson and continued to use it until his arrest in this case on July 16, 1999. (*Id.* ¶ 66.)

After Mr. Suggs was released from Manson on October 23, 1980, he reported that he returned to high school and graduated in 1982, although no confirming documentation has been produced. (*Id.* ¶¶ 38, 68.) He was discharged from parole on October 24, 1982 but taken into custody a month later after guns were found in a car in which he was traveling with two others that was pulled over for failing to obey a traffic signal. (*Id.* ¶¶ 38, 39.) At first Mr. Suggs denied knowing there were guns in the car, claiming he was only "riding around with them getting high," but later admitted that he and the others had agreed to do a robbery and were looking for a victim. (*Id.* ¶ 39.) While out on bail, he was again arrested on April 20, 1983 and charged with assault in the first degree for a drive-by shooting at his high school, reportedly arising out of a dispute during a high school dance.[6] (*Id.* ¶ 40.) He was convicted by his guilty plea and sentenced to a total effective term of five years for conspiracy to commit robbery and assault in the first degree. (*Id.* ¶ 39.) He served three years in state custody from September 30, 1983 to February 14, 1986 when he was released to community supervision. (*Id.* ¶ 39.) Three weeks after his release, he left the halfway house without permission and was rearrested and incarcerated from July 15, 1986 to May 1, 1987, when he was discharged. (*Id.*)

In the latter part of 1987 and throughout 1988, Mr. Suggs was arrested on five separate occasions and charged with criminal trespass, criminal mischief, carrying a

---

[6] The victim was shot in the leg and hospitalized in critical condition due to loss of blood but survived. (*Id.*)

5

dangerous weapon, unlawful discharge of a firearm, first degree attempted assault, and breach of the peace. (*Id.* ¶¶ 42-46.) On February 8, 1989, Mr. Suggs was arrested and pled guilty to first degree robbery and assault for entering a gas station, demanding money and shooting the attendant. (*Id.* ¶ 47.) In the state presentence report, Mr. Suggs stated: "I was shocked when I read about the robbery. I was up about six days getting high drinking gin and doing dope. I don't even remember shooting the guy. When police told me I shot a guy, I couldn't believe it. I feel bad. I wasn't myself." (*Id.*) He was sentenced to twenty years' incarceration, suspended after fourteen, for the robbery, and ten years for the assault, to run concurrently. (*Id.*)

In addition to the gas station robbery, he also entered guilty pleas under the *Alford* doctrine to two assaults that occurred on January 30, 1989 during which Mr. Suggs was accused of punching and robbing two men, aged seventy-seven and eighty-three, respectively, and taking their wallets. (*Id.* ¶¶ 48-49.) He was given concurrent sentences of ten, five, and two years of incarceration to run concurrently with his first degree robbery sentence related to the gas station shooting conviction. (*Id.*) After serving eight years in state prison, Mr. Suggs was released to community supervision on August 27, 1997. (*Id.* ¶ 47.) He again escaped from community release on November 17, 1997. (*Id.* ¶ 50). On July 16, 1999, he was arrested on federal Hobbs Act and firearm charges. (*Id.* ¶ 17.)

   d. *Federal Charges*

On July 16, 1999, Mr. Suggs was arrested by New Haven police after a café owner notified them that he believed there was a man with a gun inside his café. (*Id.* ¶¶ 14-16.) After confiscating a loaded firearm and a small amount of crack from Mr. Suggs, the state forensic laboratory connected the gun to a robbery that had occurred two days prior at a

6

New Haven gas station. (*Id.* ¶ 18.) At trial, the jury found Mr. Suggs liable for threatening the attendant at that gas station with the firearm, demanding that the attendant give him money, and taking several shots at the attendant at the door of the vestibule in an attempt to reach the cash register. (*Id.* ¶ 8.) While Mr. Suggs was climbing through the interior window of the vestibule to get behind the counter, the attendant escaped, and Mr. Suggs made off with thirty to forty dollars of lottery proceeds kept in a separate box on the counter. (*Id.* ¶¶ 8, 11.)

Mr. Suggs was first indicted on October 19, 1999 [Doc. # 1] and was arraigned on a second superseding indictment on January 21, 2000 [Doc. # 20]. The Government filed its § 851(a) notice under § 3559(c)(4) on May 15, 2000. (Information at 1.) Mr. Suggs was found guilty by a jury on June 14, 2000 and was sentenced to mandatory life imprisonment on September 8, 2000. (Judgment [Doc. # 71].)

## II. Discussion

### a. *Sentence Reduction and the COVID-19 Pandemic*

Defendant moves for release under 18 U.S.C. § 3582(c)(1)(A), which provides that

> the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Although incarcerated persons previously could only seek compassionate release from the BOP, the First Step Act of 2018 permits federal prisoners to seek relief from the federal courts upon exhaustion of administrative rights. *See* 18 U.S.C. § 3582(c)(1)(A). In "shift[ing]

7

discretion from the [BOP] to the courts," the First Step Act brought about monumental change in an incremental way, paving the way for "the release of thousands of imprisoned people who[] did not need to be incarcerated" by, "giving discretion to an appropriate decisionmaker," instead of "mandating more lenient outcomes." *United States v. Brooker*, 976 F.3d 228, 230 (2d Cir. 2020). By empowering district courts to reduce sentences and release prisoners, Congress intended to expand, expedite, and improve the process of compassionate release. *Id.* at 235. This has resulted in a substantial increase between the number of inmates released in 2018 and the number of those released in 2019. *See* U.S. SEN. COMM'N, *The First Step Act of 2018; One Year of Implementation* 47 (Aug. 2020) ("During Year One [December 21, 2018 – December 20, 2019], 145 motions seeking compassionate release were granted, a five-fold increase from fiscal year 2018.").

A "district court's discretion in this area [] is broad" and "the only statutory limit on what a court may consider to be extraordinary and compelling is that rehabilitation *alone* shall not be considered an extraordinary and compelling reason." *Brooker*, 976 F.3d at 237-38 (internal quotations omitted) (emphasis in original). Other considerations include the defendant's "age at the time of [the] crime, . . . the injustice of [a] lengthy sentence," and "the present coronavirus pandemic." *Id.* at 238; *see also United States v. McCoy*, No. 20-6821, 2020 WL 7050097, at *9 (4th Cir. Dec. 2, 2020) (agreeing with the Second Circuit that district courts have full discretion to define what is "extraordinary and compelling"); *United States v. Jones*, No. 20-3701, 2020 WL 6817488, at *9 (6th Cir. Nov. 20, 2020) (same); *United States v. Gunn*, No. 20-1959, 2020 WL 6813995, at *2 (7th Cir. Nov. 20, 2020) (same).

This broad discretion extends to the type of relief granted as well. While the majority of inmates granted relief under § 3582(c)(1)(A) are released immediately, the Second Circuit

8

noted that "compassionate release is a misnomer" as the modifications to the statute "in fact speak[] of sentence reductions." *Brooker*, 976 F.3d at 237. A "district court could, for instance, reduce but not eliminate a defendant's prison sentence, or end the term of imprisonment but impose a significant term of probation or supervised release in its place." *Id.*; *see e.g. United States v. Rios*, No. 3:94CR112 (JBA), 2020 WL 7246440 (D. Conn. Dec. 8, 2020) (reducing but not eliminating the defendant's sentence from life to 30 years); *United States v. Henareh*, No. 11-CR-93-1 (JSR), 2021 WL 119016, at *6 (S.D.N.Y. Jan. 13, 2021) (reducing but not eliminating the defendant's sentence with a new release date in 2025). The First Step Act therefore empowers district courts to address exigencies of the present and injustices of the past by employing a variety of alternative forms of relief.

    b. *Mr. Suggs's Motion for Release*

Analysis of Mr. Suggs's motion proceeds in two parts—first the Court must determine if there exist extraordinary and compelling reasons warranting relief and then determine if those reasons are impacted by the sentencing factors laid out by 18 U.S.C. § 3553(a).

        i.      *Extraordinary and Compelling Reasons for Release*

           A.   *Medical Conditions*

Mr. Suggs argues, and the Government concedes, that his medical conditions, including obesity and cardiovascular disease, constitute extraordinary and compelling grounds in the context of the COVID-19 pandemic. While the Otisville facility continues to experience COVID-19 spikes, infections currently appear to be under better control,[7] and Mr.

---

[7] The number of reported inmate cases at Otisville FCI tripled in the month of April 2021, from thirty-four total reported inmate cases as of March 15, 2021, to sixty total cases as of April 9, 2021, to ninety-six total cases among inmates reported as of May 12, 2021. COVID-19, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (accessed Mar. 15, 2021, Apr. 7, 2021, and May 12, 2021 respectively). This outbreak, a full year into the pandemic,

9

Suggs's receipt of the vaccine has markedly reduced his risk of severe infection and consequently the weight of this factor in warranting his release. S*ee also United States v. Poupart,* No. 3:11CR116 (JBA), 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021) ("The opportunity for individually-identifiable inmates to opt to receive the COVID-19 vaccine represents a sea change from their previous COVID-19 infection vulnerability and inability to protect themselves against the virus, even with comorbidities."). However, newly available data describe the existence of "breakthrough infections" caused by COVID variants in vaccinated populations. *See* Ezgi Hacisuleyman, et. al*, Vaccine Breakthrough Infection with SARS-CoV-2 Variants*, NEW ENGL. J. MED. (2021), https://www.nejm.org/doi/full/10.1056/NEJMoa2105000 (explaining that "immunizations are proving to be less potent against the variant first identified in South Africa" and emphasizing "the need to maintain layers of mitigation strategies"); CDC, V*accine Information for People with Certain Medical Conditions*, https://www.cdc.gov/vaccines/covid-19/health-departments/breakthrough-cases.html (last updated May 14, 2021) (writing that "vaccine breakthrough cases are expected[, and] there will be a small percentage of people who are fully vaccinated who still get sick, are hospitalized, or die from COVID-19"). Although Mr. Suggs's odds of experiencing serious illness are now substantially reduced, they are not non-existent, particularly given the impossibility of consistent social distancing while incarcerated in a congregate setting. *See* CDC, *Guidance for Shared or Congregate Housing*, https://www.cdc.gov/coronavirus/2019-

---

demonstrates how quickly COVID-19 can sweep through a communal living environment, even at an institution that had a proven record of successfully containing the virus. However, the BOP now reports zero active inmate cases and 1 active staff member case at Otisville, so it appears the most recent outbreak has been contained. *Id.*

ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html (last updated Dec. 31, 2020). Considering Mr. Suggs's significant risk, this factor supports his application for compassionate release.

### B. Age of First Arrest and Drug Abuse

In the forty-five years since Mr. Suggs was first arrested at age twelve, substantial research has documented the role that age and substance abuse may play in determining outcomes for criminal defendants.[8] Mr. Suggs's youthful interaction with the criminal justice system,[9] his introduction to crack cocaine while incarcerated as a teenager, and his twenty-

---

[8] Also, as general context, Mr. Suggs's identity as an African-American male may also have contributed to his initial involvement with the criminal justice system, as one of his convictions as a young black male resulted from his failure to obey a traffic signal while driving with three other young black males. (*See* Presentence R. ¶ 39). After being pulled over for this traffic violation, the police discovered guns in the vehicle. (*Id.*) The phenomenon of "driving while black" was a type of racial profiling used predominantly in the late 1990s and early 2000s that often resulted in the unlawful and unconstitutional search of black men and contributed to the racial disparity of the federal prison population. *See* David A. Harris, *The Stories, the Statistics, and the Law: Why "Driving While Black" Matters*, 84 MINN. L. REV. 265 (1999); Adero S. Jernigan, *Driving While Black: Racial Profiling in America*, 24 LAW & PSYCHOL. REV. 127 (2000); Katheryn K. Russell, *"Driving While Black": Corollary Phenomena and Collateral Consequences*, 40 B.C. L. REV. 717 (1999).

[9] Forty years after Mr. Suggs's first arrest, the Supreme Court held that mandatory life without parole and the death penalty for those under eighteen at the time of their crimes violates the Eighth Amendment because "juveniles have diminished culpability and greater prospects for reform" than adults. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (holding mandatory life without parole for juvenile defendants unconstitutional); *see Montgomery v. Louisiana,* 136 S. Ct. 718, 737 (2016), as revised (Jan. 27, 2016) (holding that *Miller* can be applied retroactively); *Graham v. Florida*, 560 U.S. 48, 82 (2010), as modified (July 6, 2010) (finding unconstitutional life without parole for a juvenile offender who did not commit homicide); *Roper v. Simmons*, 543 U.S. 551 (2005) (holding the death penalty unconstitutional for juveniles). Although recent years have seen the decriminalization and deinstitutionalization of Connecticut's juvenile justice system, the period when Mr. Suggs was a teenager in the late 1970s to early 1980s marked a time of increasing sanctions against younger defendants. *Compare* COLETTE MARCELLIN & SAMANTHA HARVELL, *Data Snapshot of Youth Incarceration in Connecticut: 2020 Update*, URBAN INSTITUTE (May 6, 2020) (noting the closure of the state's only remaining youth prison and the sharp decline in youth detention generally); *Facts & Figures on Conn.'s Juv. Just. System*, STATE OF CONN. OFFICE OF POLICY AND MANAGEMENT (2016); *with* CONN. GEN. ASSEMB., LEGIS. PROGRAM REV. AND INVESTIGATIONS COMM.,

year addiction to crack-cocaine apparently without drug rehabilitation support services until he entered the federal system in his late thirties,[10] provide more context for his serious criminal record. Since completing the Drug Education Program at Lewisburg in 2003, he has remained sober and discipline-free and concludes that age helped him see the world through a different lens. While there is no way to know whether or how Mr. Suggs's life may have been different if he had been treated in the more rehabilitative manner with which many courts now address young or drug-addicted offenders, this change in societal understanding and judicial recognition of the impact of youth and substance abuse on criminal behavior bears acknowledgment, particularly when Mr. Suggs's mandatory lifetime sentence was predicated on offenses he committed while a teenager with a serious and untreated drug addiction. (*See* Information at 1-2 (listing incidents that occurred in the Spring of 1983, when

---

JUV. JUSTICE IN CONN. 6, 31 (1978) (noting the passage of legislation "designed to provide harsher penalties for serious offenses by juveniles"). For example, when Mr. Suggs was first incarcerated at age sixteen, he was convicted as an adult, as reflected in the Presentence Report, because, at that time, juvenile court jurisdiction ended at age fifteen. Those non-violent burglaries landed him at Manson, where he was incarcerated with other "youth" offenders, aged sixteen to twenty-five, and introduced to crack. If the same string of burglaries had occurred today, the young Mr. Suggs would have been disciplined within the juvenile court system, which utilizes a restorative justice approach focusing on community safety, offender accountability, and rehabilitation instead of punishment. *See Juvenile Justice System*, State of Conn. Office of Policy and Management https://portal.ct.gov/OPM/CJ-JJYD/Main-Navigation/Juvenile-Justice-System (last accessed Jun. 28, 2021).

[10] Since Mr. Suggs's initial introduction to drugs and the criminal justice system, the State of Connecticut, as well as the District of Connecticut, have increasingly recognized the role that addiction plays in both causing and exacerbating criminal behavior. Rehabilitative drug courts were first established in the state of Connecticut in 1996 but were disbanded in 2001 for budgetary reasons. GEORGE COPPOLO, OLR RESEARCH REP. TO CONN. GEN. ASSEM.; DRUG COURT (Jan. 12, 2006). A modified drug "docket" system, which allowed state judges to divert offenders to treatment, was reinstated in 2004 and continues operations today. *Id.*; *Drug Intervention Program,* JUD. BRANCH OF STATE OF CONN. (2019) https://www.jud.ct.gov/Publications/CR137C.pdf. At the federal level, the Support Court program was approved at a meeting of the Board of Judges for the District of Connecticut on April 24, 2009 and reinitiated thereafter.

Mr. Suggs was nineteen years old, as two of his four predicate offenses).) *See also United States v. Cruz,* No. 3:94-CR-112 (JCH), 2021 WL 1326851, at *7 (D. Conn. Apr. 9, 2021) (finding that defendant's age of eighteen at the time of the offense contributes to the extraordinary and compelling reasons justifying his immediate release despite his then-mandatory life sentence); *United States v. Ramsay*, No. 96-CR-1098 (JSR), 2021 WL 1877963, at *14 (S.D.N.Y. May 11, 2021) (finding that defendant's age of eighteen at the time of his offense contributes to a sentence reduction from mandatory life to 360 months).

### C. Rehabilitation

While a Defendant's rehabilitation alone is not grounds for compassionate release, an impressive record of rehabilitation may contribute to a Court's finding of extraordinary and compelling reasons. *See Brooker*, 976 F.3d at 238. Before Mr. Suggs was incarcerated for this federal offense, he appeared to be a continued public menace seemingly unwilling or incapable of staying within the boundaries of lawful conduct and racking up an astonishing twenty-one offenses despite only being out of jail for six and a half years of his adult life. (*See* Presentence R. ¶¶ 29-50.) According to Mr. Suggs, his uncontrolled drug addiction dominated his behavior throughout this time as he struggled to maintain employment or stay out of state prison. He dropped out of high school in 1979 and, although the Presentence Report states that he reported graduating high school, records reflecting that graduation were never made part of his probationary file. (*Id.* ¶ 68.)

Mr. Suggs's prison record reflects a changed man. Since his federal incarceration began, Mr. Suggs has remained sober and almost entirely discipline free. He completed a drug rehabilitation program at Lewisburg in 2003 and reports that he has not touched drugs in over twenty-one years. (Drug Ed. Cert., Ex. E to Def.'s Mot. [Doc. # 127-6].) His sole disciplinary infraction occurred in 2003 and, despite being transferred among multiple

13

institutions, he has not received a single ticket in the eighteen years since that first infraction. (BOP Disc. Record, Ex. F to Def.'s Mot. [Doc. # 127-7].) He has spent more than 272 hours studying for his General Education Degree and has supplemented that work with a variety of other courses, including a forklift training class and a program on rational thinking analysis. (BOP Ed. Record, Ex. D to Def.'s Mot. [Doc. # 127-5].) Throughout his time in the federal prison system, Mr. Suggs has worked in a variety of jobs, including in the kitchen, as a trash collector, in the sewing department, and, most recently, as a computer orderly maintaining the prison's email system at Otisville. (Letter from Mr. Suggs, Ex. C to Def.'s Mot. [Doc. # 127-4].) At USP Allenwood, he learned how to reupholster chairs and was elevated to a leadership position within Quality Assurance, where he assigned tasks to other inmates and inspected the chairs for defects when they were completed. (*Id.*)

At Otisville, Mr. Suggs also participates in a "lifers" group, where he "tr[ies] to help people so that they don't come back and have to go through what I been through." (Letter from Mr. Suggs at 1.) He notes that "most of the lifers have been released through various court actions" and "[n]one have come back [because] we are all older now." (*Id.*) He writes of his hope that he may soon experience freedom and "continue to change and stay positive and help people to never hurt others again." (*Id.*)

At the virtual hearing held on March 2, 2021 on Defendant's motion, he took full and earnest responsibility for his past actions generally, reflecting that he was lucky to have not killed anyone with his prior conduct. He views himself as now an older, calmer, and, most importantly, sober individual than he was when he entered the BOP, and his conduct while incarcerated reflects this personal growth. When asked by the Court about his turnaround, Mr. Suggs offered this simple explanation—he no longer has the urge to get high. With his addiction under control, Mr. Suggs has shown himself to be a productive and reliable member of his prison community.

Neither Mr. Suggs's medical conditions, age of first contact with the justice system, history of untreated drug addiction, nor impressive rehabilitation alone warrants a sentence reduction under § 3582(c)(1)(A). However, considering the confluence of these factors, the Court concludes that Mr. Suggs has demonstrated that extraordinary and compelling reasons exist to reduce his life sentence.[11]

## ii. *§ 3553 Sentencing Factors*

Having found extraordinary and compelling reasons for a sentence reduction, the Court must now consider the relevant factors of 18 U.S.C. § 3553(a) to determine whether or when Mr. Suggs should be released. Relevant factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed –
>   (A) to reflect the seriousness of the offense, [] and to provide just punishment for the offense
>   (B) to afford adequate deterrence to criminal conduct;
>   (C) to protect the public from further crimes of the defendant; and . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a).

### A. *Nature and Circumstances of the Offense and Characteristics of the Defendant*

Mr. Suggs's criminal history is remarkably lengthy and often violent; his state record includes eleven nonviolent burglaries, four miscellaneous nonviolent offenses, including two

---

[11] The Second Circuit affirmed the "sound discretion of the trial court" to consider factors like the age, length of sentence, and the COVID-19 pandemic "in isolation or combination" to "reduce but not eliminate a defendant's prison sentence" when appropriate. *Brooker*, 976 F.3d at 237-38.

escapes from community supervision, three unlawful possessions of firearms, one first degree assault, and five violent robberies, one of which involved a firearm. (*See generally* Presentence R.) His federal offense involved brandishing and discharging a firearm multiple times at the terrified store attendant. This lengthy history resulted in Mr. Suggs being designated a Criminal History Category VI at sentencing. (*Id.* ¶ 8, 72.)

While the circumstances of Mr. Suggs's offenses of course are of continuing concern to Court, the current characteristics of Mr. Suggs are markedly different than they were twenty-two years ago. *See United States v. Rose*, 379 F. Supp. 3d 223, 233–34 (S.D.N.Y. 2019), aff'd, 841 F. App'x 328 (2d Cir. 2021) (concluding that "the district court [must] be able to consider the most recent evidence of a defendant's life and characteristics, which may be the most probative information available, when deciding whether a defendant should continue to be incarcerated or, in some cases, be immediately released"). Although the Court once encountered a violent and drug-addicted man, the Court now perceives a sober, thoughtful, well-adjusted, calm, sincere, and remorseful fifty-eight-year-old man, who appears in control of himself and displays an understanding of his past failures and future values and goals. By obtaining a forklift operator's certificate and upholstery experience, Mr. Suggs has acquired skills that should make him more employable upon release, and the Court is encouraged by his desire to continue to grow even while serving a life sentence.

### B. The Need to Reflect Just Punishment and Protect the Public from Further Crimes of the Defendant

Mr. Suggs's life sentence is predicated not simply on this one criminal case, but rather on his lifetime of criminal conduct. He has served almost the entirety of his adult life behind bars, and thus it is impossible to know with any certainty whether Mr. Suggs will again pose such a risk to the community when released. While Mr. Suggs expressed confidence that he will not return to a life of crime driven by his once insatiable need to get high, it is clear that

prior incarcerations previously had no deterrent effect on him, and how he will handle the pressures of the outside world after nearly a lifetime of incarceration necessarily remains unknown. However, the Court is reassured by his twenty-plus years of sobriety, clean disciplinary record, and thoughtful self-reflection on the type of support he would need to make the transition out of federal prison. Immediate release is not warranted, but after some period of re-entry planning and appropriate community release programming, the structure of supervised release and the substantial resources of the U.S. Probation Office would be available to support and monitor him on supervision. Moreover, the promised support by his ex- and future wife Tracey Suggs, who has actively supported him throughout his lengthy incarceration, adds an important element to the formula for Mr. Suggs's successful release into society with sufficiently reduced risk to the public.

### C. Sentencing Disparities

Mr. Suggs appears to be one of only two individuals on whom was imposed a mandatory life sentence based on an § 851 notice in the District of Connecticut and the only one still incarcerated.[12] In the Second Circuit generally, there are only three other individuals serving life sentences imposed pursuant to § 3559(c) and § 851. *See Matthews v. United States*, No. 5:05-CR-519, 2017 WL 10775774 (N.D.N.Y. Oct. 20, 2017) (motion for compassionate release denied Jun. 17, 2020 because "his ethnicity [does not] warrant[] immediate release from the custody of the [BOP] in light of the danger posed by the COVID-19 pandemic"); *Johnson v. United States*, No. 96-CR-932(FB), (E.D.N.Y. Sept. 21, 2001) (pending motion to vacate under 28 U.S.C. § 2255); *United States v. Vernon Snype*, No. 02 CR. 00939-3(DC), 2021 WL 1178238 (S.D.N.Y. Mar. 29, 2021) (compassionate release denied

---

[12] *See supra* n.2.

without prejudice, to be renewed when defendant turns 70 years old).[13] Thus, this factor cannot be meaningfully assessed comparatively.

### iii. Reduction in Sentence

After thorough consideration of the § 3553(a) factors, including Defendant's twenty-two years of incarceration to date on this conviction, Defendant's remorseful and positive attitude, exemplary disciplinary history, and assiduous rehabilitative efforts and consideration of Defendant's serious health issues during the COVID-19 pandemic, the Court concludes that the interests of justice weigh in favor of a reduced sentence under § 3582(c)(A)(i). To reflect Mr. Suggs's lengthy criminal history and the gravity of some of his offenses, the Court follows the Second Circuit's admonishment to "reduce but not eliminate a defendant's prison sentence," *Brooker*, 976 F.3d at 237, and reduces Defendant's sentences to thirty years (360 months). With application of Defendant's good time credit, the Court anticipates that Mr. Suggs will be eligible for release from federal custody to community confinement in a few years, and his employment through a Residential Reentry Center will solidify his ability to adjust on supervised release.

## III. Conclusion

---

[13] *See also United States v. Carroll*, No. 4:98-CR-351 RLW, 2020 WL 8024485, at *7 (E.D. Mo. Sept. 14, 2020) (releasing an individual sentenced under § 3559(c) whose life sentence was predicated on a manslaughter and robbery that he committed at age 16, noting that "the Court cannot conclude that Carroll poses no risk at all to public safety [given] the nature and circumstances of his offenses [] and his lengthy criminal history involving similar offenses. However, given Carroll's age, serious health problems, the substantial amount of time he has already served, and his positive prison record, factors which are now a part of his history and characteristics, the Court finds the risk of Carroll engaging in further criminal conduct is minimal and can be managed through the terms of his supervised release."); *United States v. Williams*, No. 3:04CR95(MCR), 2020 WL 1751545, at *3 (N.D. Fla. Apr. 1, 2020) (releasing an inmate sentenced under § 3559(c) for health reasons in light of the pandemic).

For the foregoing reasons, Defendant's Motion for a Sentence Reduction [Doc. # 127] is GRANTED and Defendant's total effective sentence is hereby reduced to 360 months. Upon release, he shall serve eight years on supervised release on Counts 1 and 2, and five concurrent years on Count 3. He must comply with the standard and mandatory conditions of supervised release. Special conditions are that he shall be on home confinement for the first seven months of supervised release on a form of location monitoring to be chosen by the U.S. Probation Office, that he participate in a full-time job skills development or education program if he is not employed or in school full time, and that he participate in mental health counseling and/or a cognitive behavioral therapy program approved or provided by the U.S. Probation Office. He shall also perform 200 hours of approved community service.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of June 2021.